# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

**ELLIOTT D. ALLEN,**

     **Plaintiff,**

     **v.**

**CAROLYN W. COLVIN, Acting Commissioner of Social Security,[1]**

     **Defendant.**

**No. 12 C 0903**

**Magistrate Judge Mary M. Rowland**

## MEMORANDUM OPINION AND ORDER

Plaintiff Elliott D. Allen filed this action seeking review of the final decision of the Commissioner of Social Security (Commissioner) denying his applications for Disability Insurance Benefits and Supplemental Security Income under Titles II and XVI of the Social Security Act (SSA). 42 U.S.C. §§ 416, 423(d), 1381a. The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c), and Plaintiff has filed a motion for summary judgment. For the reasons stated below, the Commissioner's decision is affirmed.

## I. THE SEQUENTIAL EVALUATION PROCESS

To recover Disability Insurance Benefits (DIB) or Supplemental Security Income (SSI) under Titles II and XVI of the SSA, a claimant must establish that he or she is

---

[1] On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security and is substituted for her predecessor, Michael J. Astrue, as the proper defendant in this action. Fed. R. Civ. P. 26(d)(1).

disabled within the meaning of the SSA.[2] *York v. Massanari*, 155 F. Supp. 2d 973, 977 (N.D. Ill. 2001). A person is disabled if he or she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a). In determining whether a claimant suffers from a disability, the Commissioner conducts a standard five-step inquiry:

1. Is the claimant presently unemployed?

2. Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least 12 months?

3. Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?

4. Is the claimant unable to perform his or her former occupation?

5. Is the claimant unable to perform any other work?

20 C.F.R. §§ 404.1509, 404.1520, 416.909, 416.920; *see Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985). "The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner." *Clifford*, 227 F.3d at 868.

---

[2] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 *et seq*. The SSI regulations are virtually identical to the DIB regulations and are set forth at 20 C.F.R. § 416.901 *et seq*.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI on March 25, 2008, alleging that he became disabled on April 30, 2007, because of head injury, headaches, cerebellar stroke, blurry vision, hypertension, high cholesterol, and high blood pressure. (R. at 17, 156–65, 175, 180). The application was denied initially and on reconsideration, after which Plaintiff filed a timely request for a hearing. (*Id.* at 17, 87–90, 109–11).

On June 14, 2010, Plaintiff, represented by counsel, testified at a hearing before an Administrative Law Judge (ALJ). (R. at 17, 32–86). The ALJ also heard testimony from John B. Cavenagh, M.D., a medical expert (ME), and Thomas F. Dunleavy, a vocational expert (VE). (*Id.*).

The ALJ denied Plaintiff's request for benefits on September 15, 2010. (R. at 17–26). Applying the five-step sequential evaluation process, the ALJ found, at step one, that Plaintiff has not engaged in substantial gainful activity since April 30, 2007, the alleged onset date. (*Id.* at 19). At step two, the ALJ found that Plaintiff has medically determinable severe impairments that cause limitations in his capacity to perform substantial gainful activity. (*Id.*). At step three, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meet or medically equal the severity of any of the listings enumerated in the regulations. (*Id.* at 19–20).

The ALJ then assessed Plaintiff's residual functional capacity (RFC)[3] and determined that he has the RFC to perform a wide range of light work:

> [Plaintiff] can lift and carry 10 pounds occasionally and 20 pound[s] frequently with resting (sitting) 3 times during an 8-hour workday, in addition to regular breaks and lunch (sitting would be for approximately 5 minutes). [Plaintiff] can also sit/stand/walk for 6 hours per 8-hour workday. [Plaintiff] can perform work that does not require repetitive motions with the neck; and cannot climb ladders, ropes or scaffolds. He can occasionally bend, squat and reach above shoulder level. Lastly, [Plaintiff] must avoid commercial driving or working at unprotected heights.

(R. at 20–21). Based on Plaintiff's RFC, the ALJ determined at step four that Plaintiff was unable to perform past relevant work as a housekeeper and shuttle driver. (*Id.* at 24–25). At step five, based on Plaintiff's RFC, his vocational factors and the VE's testimony, the ALJ determined that there are jobs that exist in significant numbers in the regional economy that Plaintiff can perform, including work as laundry folder, cafeteria attendant, and cashier. (*Id.* at 25–26). Accordingly, the ALJ concluded that Plaintiff was not suffering from a disability as defined by the SSA. (*Id.* at 26).

The Appeals Council denied Plaintiff's request for review on November 15, 2011. (R. at 3–7). Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561–62 (7th Cir. 2009).

---

[3] Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity. 20 C.F.R. § 404.1520(a)(4). "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675–76 (7th Cir. 2008).

# III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the SSA. In reviewing the decision, the Court may not engage in its own analysis of whether the plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). The Court must critically review the ALJ's decision to ensure that the ALJ has built an "accurate and logical bridge from the evidence to his conclusion." *Young,* 362 F.3d at 1002. Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent mean-

ingful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

# IV. DISCUSSION

## A. The Relevant Medical Evidence

On April 19, 2007, x-rays revealed that Plaintiff had degenerative changes in his lumbosacral spine. (R. at 292). On March 15, 2008, Plaintiff presented at Provident Hospital emergency room complaining of headaches, blurred vision, and dizziness. (*Id.* at 249). A CT scan revealed a left cerebellar stroke, and Plaintiff was transferred to Stroger Hospital. (*Id.* at 249–50, 256, 273–77, 294–95). An MRI confirmed the stroke and identified ischemic changes with no intracranial bleeding and intact posterior arterial circulation. (*Id.* at 291). Upon neurologic examination, Plaintiff had an unsteady gait—trips some—and "very unsteady" with tandem gait.[4] (*Id.* at 276). On March 27, 2008, Plaintiff was status post left cerebellar intact with improvement, but was unable to tandem gait. (*Id.* at 272).

On July 5, 2008, Norbert De Biase, M.D., conducted an internal medicine consultative examination on behalf of the Commissioner. (R. at 298–301). Plaintiff reported seizure history, drowsiness, headaches, chest pain, high blood pressure, and blurry vision. (*Id.* at 298–99). He also stated that his stroke affects his right side, complaining of back pain running down his legs bilaterally, arthritis, and loss of

---

[4] Tandem gait is a method of walking where the toes of the back foot strike the heel of the front foot at each step. Neurologists sometimes ask patients to walk in a straight line using tandem gait to test for ataxia—a non-specific clinical manifestation implying dysfunction of the parts of the nervous system that coordinate movement, such as the cerebellum. <http://en.wikipedia.org/wiki/Tandem_gait>

balance, which necessitates walking with a cane. (*Id.* at 299). Dr. De Biase found Plaintiff to be in no acute distress, awake, alert, oriented, stable affect, and a good historian. (*Id.*). On a musculoskeletal examination, Dr. Biase found that Plaintiff was able to walk 50 feet unassisted but that his gait was abnormal, secondary to limping on left side minimally. (*Id.* at 300). Plaintiff had severe difficulty with heel/toe walking, squatting, and tandem gait due to loss of balance. (*Id.*). Straight leg raising test (SLR) was positive, lying position at 30° bilaterally and sitting position negative bilaterally.[5] (*Id.*). Dr. De Biase found tenderness in both hips, both feet, and lower back, but Plaintiff's range of motion was free, full, and painless in all joints, except for both shoulders, lumbosacral spine, and left hip. (*Id.*). On a neurological examination, Dr. De Biase found that Plaintiff's strength, sensation, and deep tendon reflexes were symmetric and normal throughout. (*Id.*). Plaintiff's motor strength was 5/5, and a cerebellar test was negative. (*Id.*). On a mental status examination, Dr. De Biase found Plaintiff's orientation, memory, appearance, behavior, and ability to relate during the examination "were entirely within normal limits." (*Id.*). Plaintiff's affect was normal without any signs of a depressive disorder and without any signs of agitation, irritability, or anxiety. (*Id.*). Dr. De Biase diagnosed history of head injury status post assault; history of stroke; history of chest pain; history of hypertension, stable; history of hypercholesterolemia; history of impaired vision; and history of back pain/arthritis, uncontrolled. (*Id.* at 301).

---

[5] The SLR test is used "to determine whether a patient with low back pain has an underlying herniated disk." <http://en.wikipedia.org/wiki/Straight_leg_raise> "If the patient experiences sciatic pain when the straight leg is at an angle of between 30 and 70 degrees, then the test is positive and a herniated disc is likely to be the cause of the pain." *Id.*

On the same day, a lumbar spine x-ray found that Plaintiff's vertebral bodies were intact, alignment normal, and disc spaces normal. (R. at 308). The x-ray revealed degenerative osteophyte formation at multiple levels, and multilevel degenerative spurring was diagnosed. (*Id.*). A left hip x-ray found that Plaintiff's bones, joint spaces, and soft tissues were normal. (*Id.*).

On July 18, 2008, Young-Ja Kim, M.D., a nonexamining, state-agency physician, prepared a physical RFC assessment. (R. at 309–16). After reviewing the medical record, Dr. Kim concluded that Plaintiff was able to occasionally lift 20 pounds, frequently lift 10 pounds, and stand, walk, and sit for six hours in an eight-hour workday. (*Id.* at 310). Dr. Kim also opined that Plaintiff could not climb ladders, ropes, or scaffolds, and could only balance occasionally. (*Id.* at 311).

On August 12, 2008, Plaintiff presented to the emergency room, complaining of pain in his right hip and thigh. (R. at 322). In a follow-up visit on September 11, 2008, Plaintiff complained of head pain. (*Id.* at 352). The treatment records indicated persistent sciatica and neck pain. (*Id.*). Plaintiff was assessed with neck pain, left cerebellar stroke, high blood pressure controlled with medication, and chest pain "now controlled." (*Id.*).

Plaintiff started treating with Venkata Dontaraju, M.D. on January 6, 2009. (R. at 358). Plaintiff complained of intermittent headaches, associated with dizziness and blurred vision; neck pain, which sometimes goes to the right shoulder; and lower back pain, radiating to the right side and back of right thigh. (*Id.*). On examination, Plaintiff was unable to tandem walk because of unsteadiness, had sluggish re-

flexes bilaterally, normal motor strength at 5/5, and positive SLR. (*Id.*). Dr. Dontaraju diagnosed previous cerebellar stroke, hypertension, lower back ache, hip pain bilaterally, and nonspecific headache and neck pain. (*Id.* at 359).

On April 7, 2009, Plaintiff had no headaches but still had pain in his right shoulder and right hip. (R. at 355). He complained of neck pain since 2005, radiating sometimes to the right shoulder and forearm. (*Id.*) He also complained of lower back ache since 2005, radiating to the right side and back of the right thigh, mainly precipitated on walking and coughing. (*Id.*). On examination, Plaintiff was unable to tandem walk because of unsteadiness, had sluggish reflexes bilaterally, normal motor strength at 5/5, and positive SLR. (*Id.*). He had good range of movement in his hips, and shoulder movements were normal with no evidence of impingement or rotator cuff problems. (*Id.*). An x-ray of the cervical spine showed severe narrowing in the C6/7 region. (*Id.* at 356). Dr. Dontaraju diagnosed previous cerebellar stroke; hypertension, poorly controlled because of medicine noncompliance; lower back ache, probably due to sciatica; hip pain bilaterally; and neck pain, radiating to the shoulder and right forearm. (*Id.*).

On December 7, 2009, Plaintiff presented at Provident Hospital for severe right shoulder pain, back pain, and bilateral hip pain. (R. at 376–77). He was diagnosed with arthritis and prescribed medication. (*Id.* at 377). Upon discharge, Plaintiff had a steady gait and reported pain as 3/10. (*Id.* at 375).

On January 14, 2010, Plaintiff underwent imaging of the lumbosacral and cervical spine. (R. at 387–88). The cervical spine test revealed multilevel degenerative

disc disease mainly in the lower half of the cervical spine and diffuse osteopenia.[6] (*Id.* at 387). The lumbosacral image revealed multilevel anterior endplate osteophytes, lower lumbar spine degenerative face arthropathy, and mild degenerative disc disease at L4/5 and L5/S1. (*Id.* at 388).

Dr. Dontaraju completed a Stroke Residual Functional Capacity Questionnaire on March 2, 2010. (R. at 368–71). He reported that Plaintiff had a left cerebellar stroke in 2008 and also suffers with hypertension, sciatica, and cervical degenerative disease. (*Id.* at 368). Plaintiff's symptoms include balance problems, vertigo/dizziness, and weakness. (*Id.*). Dr. Dontaraju's clinical findings included positive SLR and right lower leg strength at 4/5 but otherwise normal muscle power at 5/5. (*Id.*). He opined that Plaintiff's pain frequently interferes with his ability to concentrate. (*Id.* at 369). Dr. Dontaraju found that in an eight-hour workday, Plaintiff has the following exertional limitations: stand/walk for less than two hours; sit for at least six hours; at-will sit/stand/walk option; unscheduled breaks three times per shift for five minutes each; use of a cane; rarely lift ten pounds; rarely twist, stoop, crouch, or squat; and never climb ladders or stairs. (*Id.* at 369–70). Dr. Dontaraju concluded that Plaintiff would have good days and bad days and would likely miss more than four days of work per month. (*Id.* at 370). On June 29, 2010, Dr. Dontaraju submitted a letter on Plaintiff's behalf, stating that Plaintiff "requires the assistance of a cane to assist [with] balance." (*Id.* at 386).

---

[6] Osteopenia is decreased bone calcification or density. *Stedman's Medical Dictionary* 1004 (5th ed. 1982).

At the hearing, Plaintiff testified that he has had a lot of head injuries and was involved in an automobile accident in 2007. (R. at 50–52, 53–54). He stated that he is able to clean, launder, cook, and shop, but has to take his time. (*Id.* at 50). He can walk a half a block before pain makes it difficult to continue. (*Id.* at 50–51). Plaintiff also testified that he has right hip pain from a pinched nerve, which runs up and down from the back of his neck and head, and then down to his shoulders, hips, and legs. (*Id.* at 54). Most of the pain is located on his right side, which throbs or becomes numb when he lays down. (*Id.* at 55). His pain medications cause stomach problems, nausea, and dizziness. (*Id.*). Plaintiff stated that he uses a cane for balance and support. (R. at 57). While he has not fallen recently, after walking a certain distance, his balance is affected. (*Id.* at 58).

The ME testified that the medical evidence supported the diagnosis of cerebellar stroke with residual balance disturbance—apparently requiring use of a cane—and chronic pain in the neck and lower back with evidence of degenerative joint disease of the lumbar and cervical spine. (R. at 61–62). On cross-examination, the ME agreed that if Plaintiff was unable to tandem walk due to unsteadiness, it would be reasonable for Plaintiff to use a cane because of difficulty with balance. (*Id.* at 66). However, Plaintiff's balance difficulty did not alter the ME's opinion that Plaintiff was capable of standing or walking six hours in an eight-hour workday. (*Id.* at 68).

## B. Analysis

Plaintiff raises three arguments in support of his request for a reversal and remand: (1) the ALJ made an erroneous credibility finding; (2) the ALJ improperly

weighed the medical opinions; and (3) the ALJ made an erroneous step five deter-
mination. (Mot. 8–15). The Court addresses each argument in turn.

### 1. *Plaintiff's Credibility*

Plaintiff contends that the ALJ erred in discounting his testimony about the na-
ture and extent of his ailments. (Mot. 9–12). He asserts that the ALJ's credibility
determination was conclusory boilerplate, erred in discrediting Plaintiff's need for a
cane, and erred in discrediting Plaintiff's mental limitations. (*Id.*).

In determining credibility, "an ALJ must consider several factors, including the
claimant's daily activities, [his] level of pain or symptoms, aggravating factors, med-
ication, treatment, and limitations, and justify the finding with specific reasons."
*Villano*, 556 F.3d at 562 (citations omitted); *see* 20 C.F.R. § 404.1529(c); Social Secu-
rity Ruling (SSR)[7] 96-7p. An ALJ may not discredit a claimant's testimony about his
symptoms "solely because there is no objective medical evidence supporting it." *Vil-
lano*, 556 F.3d at 562 (citing SSR 96-7p; 20 C.F.R. § 404.1529(c)(2)); *see Johnson v.
Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006) ("The administrative law judge cannot
disbelieve [the claimant's] testimony solely because it seems in excess of the 'objec-
tive' medical testimony."). Even if a claimant's symptoms are not supported *directly*
by the medical evidence, the ALJ may not ignore *circumstantial* evidence, medical

---

[7] SSRs "are interpretive rules intended to offer guidance to agency adjudicators. While
they do not have the force of law or properly promulgated notice and comment regulations,
the agency makes SSRs binding on all components of the Social Security Administration."
*Nelson v. Apfel*, 210 F.3d 799, 803 (7th Cir. 2000); *see* 20 C.F.R. § 402.35(b)(1). While the
Court is "not invariably *bound* by an agency's policy statements," the Court "generally de-
fer[s] to an agency's interpretations of the legal regime it is charged with administrating."
*Liskowitz v. Astrue*, 559 F.3d 736, 744 (7th Cir. 2009).

or lay, which does support claimant's credibility. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539–40 (7th Cir. 2003). Indeed, SSR 96-7p requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) (citation omitted); *see* 20 C.F.R. § 404.1529(c); SSR 96-7p.

The Court will uphold an ALJ's credibility finding if the ALJ gives specific reasons for that finding, supported by substantial evidence. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009). The ALJ's decision "must contain specific reasons for a credibility finding; the ALJ may not simply recite the factors that are described in the regulations." *Steele*, 290 F.3d at 942 (citation omitted); *see* SSR 96-7p. "Without an adequate explanation, neither the applicant nor subsequent reviewers will have a fair sense of how the applicant's testimony is weighed." *Steele*, 290 F.3d at 942.

### a. Boilerplate Language

Plaintiff contends that the ALJ used "meaningless boilerplate" language to discredit Plaintiff's statements, which resulted in "nothing more than result-oriented decision making." (Mot. 9). In his decision, the ALJ stated in part:

> After careful consideration of the record, I find that [Plaintiff's] medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent that they are inconsistent with the above residual functional capacity assessment.

(R. at 22). This is the same language that the Seventh Circuit has repeatedly described as "meaningless boilerplate" because it "yields no clue to what weight the [ALJ] gave the testimony" and fails to link the conclusory statements made with the objective evidence in the record. *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012). "However, the simple fact that an ALJ used boilerplate language does not automatically undermine or discredit the ALJ's ultimate conclusion if he otherwise points to information that justifies his credibility determination." *Pepper v. Colvin*, — F.3d —, No. 12-2261, 2013 WL 1338123, at *14 (7th Cir. Apr. 4, 2013). The ALJ did that here.

In his decision, the ALJ also stated:

> The question in this case revolves around balance. Although a cane has not been prescribed, [Plaintiff] alleges that it should have been and that he needs it just to stand. [Plaintiff] showed that he could walk 50 feet without a cane. I also noticed that when [Plaintiff] left the hearing room, he maneuvered adroitly without the cane in standing, opening the door and moving out into the hall. The [ME] stated that difficulty with tandem walking means just that and does not translate into an inability to walk without a cane. Although [Plaintiff] alleges that he can walk ½ blocks [*sic*] without pain, nothing in the record supports his allegations.

> Additionally, although [Plaintiff] alleges that an abnormal gait would help to preclude work, that was not shown in person or in the file. The gait was not described as ataxic. It appears from the totality of the file that [Plaintiff's] use of cane is more for comfort than need. I asked [Plaintiff] the last time he fell. [Plaintiff] responded that he has not fallen recently, but he "lost his balance" and was vague about when (sometime last week).

> The [VE] admitted that if [Plaintiff] needed a cane just to stand, no jobs would be available. The source of this allegation, however, is primarily from [Plaintiff]. . . . I find his allegations regarding balance only partially credible.

(R. at 24) (citation omitted). These statements allow the Court to sufficiently analyze what the ALJ relied on when he concluded that Plaintiff was not credible. *See Pepper*, — F.3d —, 2013 WL 1338123, at *15.

### b. *Plaintiff's Use of a Cane*

Plaintiff contends that the ALJ erroneously discredited his credibility because "Plaintiff has no prescription for a cane, the cane 'is more for comfort than need,' and an abnormal gait was not shown in the file." (Mot. 9). Plaintiff misapprehends the ALJ's analysis. The ALJ does not focus on whether Plaintiff has a prescription for his cane. Instead, the ALJ found that the medical evidence contradicts Plaintiff's need for the cane just to stand. (R. at 24). At the hearing, Plaintiff stated that he needs the cane just to stand, for balance. (*Id.* at 57–58, 84). However, at the consultative examination, Plaintiff was able to walk 50 feet unassisted. (*Id.* at 300). And, when Plaintiff left the administrative hearing, he was able to stand, open the door, and walk into the hall without the use of his cane. (*Id.* at 24). The ALJ also concluded that because Plaintiff "has not fallen recently," the "cane is more for comfort than need." (*Id.*). Plaintiff argues that "the more logical interpretation would be that Plaintiff has not fallen recently because he uses the cane." (Mot. 10). But, as discussed above, Plaintiff is able to walk unassisted. (R. at 300 (walking 50 feet unassisted), 24 (standing, opening door, and walking out of the hearing room without use of cane)).

Plaintiff argues that he has a "balance disturbance requiring use of a cane." (Mot. 10). He cites medical evidence demonstrating his unsteady gait, "severe diffi-

culty" with tandem walking, heel/toe walking, and squatting, and positive SLR test. (*Id.*). Indeed, the consultative examiner found that Plaintiff had severe difficulty with heel/toe walking, squatting, and tandem gait due to loss of balance. (R. at 300). But the ME, who is board certified in internal medicine, explained that just because a person loses his balance with tandem or heel/toe walking or has a positive SLR does not translate into an inability to walk without a cane. (*Id.* at 57, 66–68, 70–71). And, there is no evidence that Plaintiff has ataxia; a cerebellar test conducted by the consultative examiner was negative. (*Id.* at 300).

### c. *Plaintiff's Mental Limitations*

Plaintiff also contends that the ALJ erred in discrediting Plaintiff's mental limitations. (Mot. 10–12). In Plaintiff's Activities of Daily Living report, he alleged memory difficulties and depression. (R. at 206–07). In his decision, the ALJ discounted these allegations, stating:

> [Plaintiff] also alleged memory difficulties; however, the report indicated that he was able to pay bills, count change, and handle a savings account and shop. . . . [Plaintiff] also alleged symptoms of depression. However, the results of the consultative examination showed that orientation, appearance, behavior and [Plaintiff's] ability to relate were entire[ly] within normal limits without signs of a depressive disorder, agitation, irritability or anxiety.

(*Id.* at 21–22) (citations omitted).

After carefully reviewing the record, the Court finds that the ALJ's credibility determination is supported by substantial evidence. *Moss*, 555 F.3d at 561. The Activities of Daily Living report was internally inconsistent. While Plaintiff vaguely alleged memory difficulties (R. at 206), the only problem he has is remembering to

take his medication (*id.* at 203). On the other hand, Plaintiff lives alone and acknowledges taking care of his personal hygiene, performing daily/weekly routines, using public transportation, shopping, paying bills, counting change, handling his savings account, and using his checkbook. (*Id.* at 201–04). At the consultative examination, Dr. De Biase opined that Plaintiff's memory was "entirely within normal limits." (*Id.* at 300). He found that Plaintiff knew the day, date, month, and year. (*Id.*). He knew the full address and suite number of the examination center. (*Id.*). He knew the names of the President and his predecessor. (*Id.*). Plaintiff knew how many months in a year and was able to perform mathematical calculations. (*Id.*).

Plaintiff contends that "an ability to take care of some chores, minimal bills and hygiene does not mean his allegations of memory problems are unfounded; indeed, many people perform these activities out of necessity and in an accommodated manner." (Mot. 11). While the ability to perform routine daily activities independently does not by itself demonstrate that Plaintiff is able to perform full-time work, *see Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 918 (7th Cir. 2003), other than asserting that he forgets to take his medication, Plaintiff has provided no evidence of a memory problem. Indeed, he did not even raise the issue at the administrative hearing.

Similarly, there is no evidence in the medical record to support Plaintiff's allegation of depression. He did not raise the issue at his hearing. Moreover, he did not complain of depression to Dr. De Biase. (R. at 298–301). And, Dr. De Biase conducted a mental status examination and found that Plaintiff's affect was normal without

signs of a depressive disorder and without signs of agitation, irritability, or anxiety. (*Id.* at 300). Plaintiff's orientation, memory, appearance, behavior, and ability to relate during the examination were entirely within normal limits. (*Id.*). His hygiene and grooming were good, and overall effort and cooperation were good. (*Id.*). From Dr. De Biase's observation, he concluded that Plaintiff was capable of responsibly managing his own funds. (*Id.*).

Plaintiff asserts that "mental impairments can increase physical pain and limitation beyond what the objective evidence alone shows, and *vice versa*." (Mot. 12). But the ALJ did find that Plaintiff has back pain and some neck pain, which he incorporated into his RFC assessment. (R. at 24). "For that reason, the [VE] gave job positions that did not require [Plaintiff] to stay rigidly at one position, such as assembly line work. [The ALJ] also precluded skilled and semi-skilled work because of the lack of attention pain could cause." (*Id.*).

Plaintiff also contends that the ALJ failed to consider his medicine side-effects. (Mot. 12). On the contrary, the ALJ took into account Plaintiff's testimony that his muscle relaxer and pain pill make him dizzy. (R. at 55; *see id.* at 79 (explicitly noting medicine side effects when formulating hypotheticals to VE)). The RFC precludes Plaintiff from climbing ladders, ropes, or scaffolds, or working at unprotected heights. (*Id.* at 21).

In sum, the Court finds no errors in the ALJ's credibility determination. The finding was supported by substantial evidence and was specific enough for the

Court to understand the ALJ's reasoning. *See Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008).

### 2. Treating Physician's Opinion

Plaintiff contends that the ALJ failed to give proper weight to the opinion of Dr. Dontaraju, his treating physician. (Mot. 12–14). Plaintiff argues that the ALJ did not proffer a supportable rationale for giving "little weight" to Dr. Dontaraju's RFC assessment. (*Id.* 13).

By rule, "in determining whether a claimant is entitled to Social Security disability benefits, special weight is accorded opinions of the claimant's treating physician." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003). The opinion of a treating source is entitled to controlling weight if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(d)(2); *accord Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008). A treating physician typically has a better opportunity to judge a claimant's limitations than a nontreating physician. *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996); *Grindle v. Sullivan*, 774 F. Supp. 1501, 1507–08 (N.D. Ill. 1991). "More weight is given to the opinion of treating physicians because of their greater familiarity with the claimant's conditions and circumstances." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). Therefore, an ALJ "must offer 'good reasons' for discounting a treating physician's opinion," and "can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining phy-

sician does not, by itself, suffice." *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) (citing 20 C.F.R. § 404.1527(d)(2); other citation omitted).

If a nontreating physician contradicts the treating physician's opinion, it is the ALJ's responsibility to resolve the conflict. *Books*, 91 F.3d at 979 (ALJ must decide which doctor to believe). An ALJ may reject the opinion of a treating physician in favor of the opinion of a nontreating physician where the nontreating physician has special, pertinent expertise and where the issue is one of interpretation of records or results rather than one of judgment based on observations over a period of time. *Micus v. Bowen*, 979 F.2d 602, 608 (7th Cir. 1992) ("[I]t is up to the ALJ to decide which doctor to believe—the treating physician who has experience and knowledge of the case, but may be biased, or . . . the consulting physician, who may bring expertise and knowledge of similar cases—subject only to the requirement that the ALJ's decision be supported by substantial evidence."); *Hofslien v. Astrue*, 439 F.3d 375, 377 (7th Cir. 2006) ("So the weight properly to be given to testimony or other evidence of a treating physician depends on circumstances.").

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, "the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Moss*, 555 F.3d at 561; *see* 20 C.F.R. § 404.1527. In sum, "whenever an ALJ does reject a treating source's opinion, a sound explanation must

be given for that decision." *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011) (citing 20 C.F.R. § 404.1527(d)(2)).

In March 2010, Dr. Dontaraju completed an RFC assessment. (R. at 368–71). Clinical findings included a positive SLR and right lower leg strength at 4/5 but otherwise normal muscle power at 5/5. (*Id.*). Dr. Dontaraju opined that Plaintiff's pain frequently interferes with his ability to concentrate. (*Id.* at 369). He concluded that in an eight-hour workday, Plaintiff can stand/walk for less than two hours; sit for at least six hours; needs an at-will sit/stand/walk option; needs unscheduled breaks three times per shift for five minutes each; requires the use of a cane; can rarely lift ten pounds; can rarely twist, stoop, crouch, or squat; and can never climb ladders or stairs. (*Id.* at 369–70). Dr. Dontaraju opined that Plaintiff would have "good days and bad days" and would likely miss more than four days of work per month. (*Id.* at 370).

In his decision, the ALJ provided a lengthy analysis of Dr. Dontaraju's RFC assessment:

> The information contained [in the RFC] is an attorney generated form from [Plaintiff's] treating source which essentially places [Plaintiff] at less than sedentary [RFC]. This is not supported elsewhere through any measurements by this treating source. The report stated that [Plaintiff] needed to rest 3 times in an 8 hour shift. [Plaintiff] would also have "good days and bad days." However, the meaning of this is not explained by the doctor in this checklist and is not measured elsewhere. Finally, the report indicated that [Plaintiff] would be absent 4 days a month. This appears to be an economic and not a medical question that the attorney submitted to the doctor. I note that no measurements supporting this checkmark appear in the file nor did the attorney question the medical expert about this. . . .

*   *   *

I give great weight to the [ME's] opinion regarding the objective evidence in the file. [Plaintiff's] treating physician's [RFC] is given little weight because it is basically unsupported, but I have considered the effects of the possible requirements for assistance and lack of attention due to pain. I give considerable weight to the hospital visits and to the consultative examiner which provides measurements. The diagnostic evidence has been very important in quantifying the medical diagnosis of a stroke with no residual effects, and degenerative spurring in the lumbar and cervical spine, as well as the lack of evidence in [*sic*] regarding [Plaintiff's] hip impairment.

(R. at 23–24).

Plaintiff complains that the ALJ improperly rejected Dr. Dontaraju's opinion because it was provided as a "checklist" on an "attorney generated form." (Mot. 13). On the contrary, the ALJ rejected Dr. Dontaraju's opinion placing Plaintiff at less than a sedentary RFC because it was not supported by the medical evidence. On examination, Dr. De Biase found Plaintiff to be in no acute distress and was able to walk 50 feet unassisted. (R. at 299, 300). Plaintiff had tenderness in both hips, both feet, and lower back, but his range of motion was free, full, and painless in all joints, except for both shoulders, lumbosacral spine, and left hip. (*Id.* at 300). On a neurological examination, Dr. De Biase found that Plaintiff's motor strength was 5/5, and his sensation, and deep tendon reflexes were symmetric and normal throughout. (*Id.*). Even Dr. Dontaraju acknowledged that Plaintiff had good range of movement in his hips and shoulders, and that other than his right lower leg strength at 4/5, Plaintiff had normal muscle power at 5/5. (*Id.* at 355, 368). Upon discharge from Provident Hospital in December 2009, Plaintiff's gait was steady and he reported pain as 3/10. (*Id.* at 375).

Plaintiff argues that "the objective medical evidence as well as the opinion of other physicians supports Dr. Dontaraju's opinion that Plaintiff is unable to engage in sedentary activity, which would require walking up to two hours per day." (Mot. 13). Plaintiff contends that Dr. Dontaraju's opinion is supported by positive SLR tests and observations that Plaintiff had difficulty with heel/toe walking and tandem gait. (*Id.*). Indeed, Dr. De Biase found positive SLR and that Plaintiff's gait was abnormal, secondary to limping on left side minimally. (R. at 300). Dr. De Biase also found that Plaintiff had severe difficulty with heel/toe walking, squatting, and tandem gait due to loss of balance. (*Id.*). But the ME, who is board certified in internal medicine, explained that just because a person loses his balance with tandem or heel/toe walking or has a positive SLR does not translate into an inability to walk without a cane. (*Id.* at 57, 66–68, 70–71). The medical evidence supports the ME's opinion. There is no evidence that Plaintiff has ataxia; Dr. De Biase observed that Plaintiff could walk 50 feet unassisted, and a cerebellar test conducted by the consultative examiner was negative. (*Id.* at 300). In December 2009, Plaintiff was discharged from Provident Hospital with a steady gait. (*Id.* at 375). And, at the conclusion of the administrative hearing, the ALJ observed Plaintiff standing, opening the door, and walking into the hall without the use of his cane. (*Id.* at 24).

Plaintiff contends that the RFC form completed by Dr. Dontaraju is "based upon [the Commissioner's] own forms, and the ALJ makes baseless criticisms of them as being biased, but then relies on [the] non-examining [physician's] checkbox forms provided by [the Commissioner]." (Mot. 13). On the contrary, the ALJ rejected Dr.

Dontaraju's RFC assessment because it was not based on any measurements by Dr. Dontaraju. (R. at 23). Dr. Dontaraju did not provide any medical support for his conclusion that Plaintiff would have "good days and bad days" and would be absent four times a month. (*See id.*). On the other hand, the state-agency physician's RFC assessment was based on his thorough review of the medical record. (*Id.* at 316). Thus, it was not error for the ALJ to discount Dr. Dontaraju's opinion, in part, because it was completed on a pre-printed form. *See Nicholson v. Astrue*, 341 F. App'x 248, 253 (7th Cir. 2009) ("[A]lthough the form [the treating physician] used had space for particular medical or clinical findings supporting his assessment, he identified no such findings."); *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008) ("A treating physician's opinion concerning the nature and severity of a claimant's injuries receives controlling weight only when it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is consistent with substantial evidence in the record.") (citation omitted); *see also Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001) ("We must keep in mind the biases that a treating physician may bring to the disability evaluation. The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability.") (citation omitted).

Moreover, the ALJ did not completely reject Dr. Dontaraju's opinion. In fact, some of Dr. Dontaraju's opinions were explicitly adopted by the ALJ in formulating the RFC. For example, the RFC includes Dr. Dontaraju's finding that Plaintiff needs unscheduled breaks three times per shift for five minutes each. (*Compare* R.

at 21 *with id.* at 369). The ALJ also adopted Dr. Dontaraju's opinion that Plaintiff has balance problems, dizziness, and weakness, which precludes Plaintiff from climbing ladders or stairs. (*Compare id.* at 21 *with id.* at 368, 370). Moreover, the ALJ precluded skilled and semi-skilled work because Plaintiff's pain interferes with his ability to concentration. (*Compare id.* at 24 *with id.* at 369).

### 3. *Step Five Determination*

Plaintiff's final argument is that the ALJ made an erroneous step five determination. (Mot. 14–15). At step five, based on Plaintiff's RFC, his vocational factors and the VE's testimony, the ALJ determined that there are jobs that exist in significant numbers in the regional economy that Plaintiff can perform, including work as laundry folder, cafeteria attendant, and cashier. (R. at 25–26). Plaintiff contends that the ALJ failed to ask the VE if his testimony conflicted with the DOT.[8] (Mot. 14).

"An ALJ has an affirmative duty to ask a vocational expert if the evidence that the expert has provided about job limitations conflicts with the job requirements listed in the DOT, and if the evidence appears to conflict, the ALJ must ask the vocational expert to explain the conflict." *Ketelboeter*, 550 F.3d at 625. Here, as the Commissioner concedes, the ALJ did not fulfill that duty at the hearing.[9] (Resp. 12).

---

[8] The Dictionary of Occupational Titles (DOT), published by the Department of Labor, gives detailed physical requirements for a variety of jobs. *Prochaska v. Barnhart*, 454 F.3d 731, 735 n.1 (7th Cir. 2006). The Social Security Administration has taken "administrative notice" of the DOT. *See* 20 C.F.R. § 416.966(d)(1).

[9] However, in the ALJ's decision, he affirmatively found that the VE's testimony was consistent with the DOT descriptions for the positions of laundry folder, cafeteria attendant, and cashier. (R. at 26).

But unless there is an actual conflict, the error is harmless. *See Ketelboeter*, 550 F.3d at 625–26 (applying harmless error to ALJ's failure to ask VE if testimony conflicted with DOT). "Moreover, to the extent that there was a conflict, SSR 00-4p requires the ALJ to obtain an explanation only when the conflict between the DOT and the VE's testimony is 'apparent.' " *Mueller v. Astrue*, 860 F. Supp. 2d 615, 639 (N.D. Ill. 2012). Because Plaintiff did not identify any potential conflict at the hearing, he must demonstrate that the conflict was "*obvious enough* that the ALJ should have picked up on [it] without any assistance." *Overman v. Astrue,* 546 F.3d 456, 463 (7th Cir. 2008) (emphasis added).

Plaintiff argues that the jobs cited by the VE are inconsistent with his RFC. (Mot. 14–15). He contends that the occupations of "laundry folder" and "cafeteria attendant" require *frequent* extending of arms in all directions, including overhead, but that the ALJ limited Plaintiff to only *occasional* reaching above shoulder level. (*Id.* 14). However, Plaintiff provides no support for his contention that laundry folder and cafeteria attendant require frequent reaching above shoulder level. Indeed, the narrative descriptions for these positions indicate that even if any reaching above shoulder level is involved, it would not be more than occasional. Specifically, an individual in the position of laundry folder

> Folds fluff-dried or pressed laundry, such as shirts, towels, uniforms, and jackets: Shakes out, smooths, folds, sorts, and stacks wash according to identification tags. Inspects pressed laundry for holes or tears, and separates defective articles for transfer to repair department. Folds laundry, preparatory to wrapping, for delivery to customer. Folds pressed shirts around cardboard forms and inserts assembly in plastic bags. May attach missing buttons to articles, using button-sewing-machine or button-attaching machine. May unload tumbler. May turn

socks, match pairs, and tie socks into bundles. May be designated according to type of laundry folded as Shirt Folder (laundry & rel.) I; Wearing-Apparel Folder (laundry & rel.).

DOT § 369.687-018. A cafeteria attendant

Carries trays from food counters to tables for cafeteria patrons. Carries dirty dishes to kitchen. Wipes tables and seats with dampened cloth. Sets tables with clean linens, sugar bowls, and condiments. May wrap clean silver in napkins. May circulate among diners and serve coffee and be designated Coffee Server, Cafeteria Or Restaurant (hotel & rest.).

DOT § 311.677-101. Nothing in these job descriptions indicates that the individual must be capable of reaching *above shoulder level* more than occasionally. And any possible inconsistencies between these descriptions and Plaintiff's RFC would not have been *obvious* to the ALJ. *Overman*, 546 F.3d at 463.

Plaintiff also contends that the ALJ failed to provide the DOT code for the cashier occupation, and cashier positions are so numerous in the DOT that it is impossible to determine if there is a conflict between the RFC and the VE's testimony. (Mot. 14–15). However, this error is harmless when a significant number of other jobs are available to a plaintiff. *Ketelboeter*, 550 F.3d at 626; *Williamson v. Astrue*, No. 10 C 0070, 2012 WL 1095395, at *11 (N.D. Ill. March 30, 2012). Here, the VE testified that 6,000 laundry folder and cafeteria worker jobs were available in the Chicago metropolitan area (R. at 82–83), a significant number. *See Liskowitz v. Astrue*, 559 F.3d 736, 743 (7th Cir. 2009) (4,000 jobs unquestionably significant); *Lee v. Sullivan*, 998 F.2d 789, 794 (7th Cir. 1993) (1,400 jobs are significant).[10]

_____

[10] Plaintiff also contends that the ALJ erred by failing to include all the physical and mental limitations identified by Plaintiff and Dr. Dontaraju in the RFC. (Mot. 14). Howev-

## C. Summary

In sum, in a thorough, meticulous, and clearly articulated decision, the ALJ has built an accurate and logical bridge from the evidence to his conclusion. The ALJ's credibility determination, treating physician analysis, and step five determination are all supported by substantial evidence.

## V. CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment or Remand [13] is **DENIED**. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is affirmed.

E N T E R:

Dated: April 29, 2013

_____
MARY M. ROWLAND
United States Magistrate Judge

---

er, as discussed above, the ALJ properly discounted Plaintiff's credibility and Dr. Dontaraju's opinion.